UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LONNIE E. THOMAS,

       Plaintiff,

    v.

CITY OF COLUMBUS, et al.,

       Defendants.

Case No. 2:15-cv-2469
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

Plaintiff Lonnie E. Thomas brings this action against the City of Columbus, Sergeant James Morrow, Jr., and Officers Mark Laughlin and Chase Rogers following his arrest, prosecution, and acquittal on charges of kidnapping and rape. Defendants' Motion for Summary Judgment [ECF No. 48] and Plaintiff's Motion in Limine to Exclude Inadmissible Evidence [ECF No. 56] are currently before the Court. For the following reasons, each motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. The 911 Call and Initial Investigation

In the early morning of July 1, 2013, a female (referred to as "HB" for privacy purposes) called 911 to report that she had just been raped. (*See* Lazar Aff. ¶ 2 [ECF No. 50-2].) HB was calling from a nearby UDF convenience store. (*See id.*) Officer Jeffrey Lazar responded to the call. (*Id.*) HB was crying, looked upset, and her shirt appeared to be torn. (*Id.* ¶ 3.) HB informed Lazar that she had been physically and sexually assaulted by Lonnie (she did not know his last name) in his fourth floor apartment in Bollinger Tower, 750 North High Street, Columbus, Ohio. (*Id.*) Lonnie's apartment, HB stated, was the second door to the left of the elevator, on the same

side as the elevator. (*Id.*) HB described Lonnie as a 200 pound, 6′2″ male with light black skin and grayish hair. (July 1, 2013 Lazar Email at 1 [ECF No. 50-2].)

Lazar transported HB to Bollinger Tower, and HB identified Lonnie's car. (Lazar Aff. ¶ 5.) By running the license plate number, Lazar determined that the suspect was Lonnie Thomas and that he lived in apartment 4G. (*Id.*)

## B.    The Officers Take Thomas into Custody

Officers Laughlin and Rogers soon arrived as backup. (*See* Laughlin Aff. ¶ 4 [ECF No. 50-4]; Rogers Aff. ¶ 6 [ECF No. 50-3].) Laughlin and Rogers got information about the incident from Lazar or dispatch and then entered the tower at about 2:52 a.m. (Laughlin Aff. ¶¶ 5–6; First Floor Surveillance Video at 2:52:34.) The officers stepped onto the elevator and arrived on the fourth floor about a minute later (Fourth Floor Surveillance Video at 2:53:30.) Laughlin spoke on his walkie talkie for about a minute and a half, and the officers then walked toward Thomas's apartment and out of the surveillance camera's view at 2:56:06. (*See id.* at 2:53:35 to 2:56:06.)

### 1.    The Officers' Account

The officers have stated in their affidavits that they came to Thomas's apartment, stood at the sides of the door, knocked, and announced "Columbus Police." (Laughlin Aff. ¶ 7; Rogers Aff. ¶ 9.) According to the officers, a male eventually opened the door and confirmed, in response to the officers' questioning, that he was Lonnie Thomas. (Laughlin Aff. ¶ 7; Rogers Aff. ¶ 9.) As Laughlin recalls, Thomas asked why the officers were there; Laughlin indicated that it was about a female who had been in the apartment, and Thomas then responded, "You mean that bitch?" or words to that effect. (Laughlin Aff. ¶ 7.) Laughlin informed Thomas that he would need to come with the officers. (*Id.*) Thomas stepped out of the doorway, and Laughlin asked him to turn around and put his hands behind his back. (*Id.* ¶ 8.) According to Laughlin, he

2

then cuffed Thomas behind the back with two sets of handcuffs linked together. (*Id.*) Laughlin and Rogers deny using force on Thomas. (Laughlin Aff. ¶ 16; Rogers Aff. ¶ 13.) They also each deny seeing the other use force on him. (Laughlin Aff. ¶ 16; Rogers Aff. ¶ 13.)

Rogers has stated that he conducted a protective sweep of Thomas's apartment that lasted less than one minute. (Rogers Aff. ¶ 11.) Rogers stated that he then shut the door and stood outside the apartment to secure the alleged crime scene. (*Id.*)

While Rogers was securing the apartment, Laughlin escorted Thomas out of the tower. (*See* Rogers Aff. ¶ 11; Laughlin Aff. ¶ 10.) Laughlin and Thomas came into view of the Fourth Floor surveillance camera at about 2:59:58; they then entered the elevator, rode to the first floor, and exited the building. (Fourth Floor Surveillance Video at 2:59:58 to 3:00:16; First Floor Surveillance Video at 3:00:31 to 3:00:36.) Laughlin brought Thomas outside, past Sergeant Morrow, and to the side of the building. (Laughlin Aff. ¶ 12.) HB was sitting in a police cruiser with Lazar near the side of the tower; she identified Thomas as the person who had allegedly assaulted her. (*Id.* ¶ 13.)

According to Laughlin, Thomas did not complain to Morrow or anyone else outside the building about his treatment while being taken into custody. (Laughlin Aff. ¶ 12.) And Morrow has stated that he does not recall speaking to Thomas or hearing Thomas say that officers used force on him. (Morrow Aff. ¶ 11 [ECF No. 50-5].)

## 2. Thomas's Account

Thomas offers a different account of how he was taken into custody. Thomas has testified that he was awakened in the early morning of July 1, 2013, by loud banging on his front door. (Thomas Dep. at 70–71 [ECF No. 46-1].) Thomas testified that he was disoriented and partially undressed as he went to the door. (*See id.* at PageID 71–72.) The individuals banging on the door

eventually identified themselves as police officers; they never came to the peephole though. (*Id.* at 74.) Thomas testified that he opened the door and saw one officer on each side of the door, each in a crouching position. (*Id.* at 80.) Thomas asked the officers why they were crouching. (*See id.* at 84.) According to Thomas, Laughlin responded by tackling him, pinning his arms, and shoving him into the door frame—bashing his head into the frame in the process. (*See id.* at 84, 96.)[1] Thomas stumbled into the hallway, where he was purportedly tripped by Laughlin, causing him to fall and hit his head on the wall. (*See id.* at 98–101.) Laughlin purportedly held onto Thomas's left arm but allowed Thomas to fall to the floor. (*See id.* at 103.) Thomas testified that as he lay on the ground, Laughlin placed a knee into his lower back and Rogers placed a knee into his neck. (*Id.* at 106.) Thomas testified that he was then cuffed with two pairs of handcuffs, which were not interlinked to create a longer chain. (*See id.* at 106, 113.) Laughlin then purportedly lifted Thomas off the floor by his arm and wrists, which caused Thomas considerable pain. (*See id.* at 117–22.)

According to Thomas, Laughlin frisked him for keys and Rogers then entered the apartment. (*See* Thomas Dep. at 125–26.) Rogers purportedly threw a pair of shoes to Thomas and then re-entered the apartment as Thomas was led away. (*See id.* at 127–28, 142.)

Thomas testified that he was escorted from the building without any explanation of why he was in police custody. (*See* Thomas Dep. at 122, 125, 142–44.) While outside, Thomas purportedly complained to Morrow that Laughlin and Rogers had violated his Fourth Amendment rights by failing to explain why he was arrested and by physically attacking him. (*See id.* at 145, 148–50.)

---

[1] In his deposition, Thomas did not identify Laughlin and Rogers by their names. (*See* Thomas Dep. at 81.) Rather, he indicated that one officer was wearing a hat and the other was not. (*See id.*) The officers' identity is clarified through their affidavits: Rogers was wearing a hat; Laughlin was not. (Laughlin Aff. ¶ 6; Rogers Aff. ¶ 8.)

## C.    The Interview at Police Headquarters

Following Thomas's identification by HB, Officer Anthony Parks drove Thomas to the Columbus Division of Police ("CDP") headquarters for further investigation. (Parks Aff. ¶ 4 [ECF No. 50-6].) Laughlin followed in a separate cruiser. (*Id.*; Laughlin Aff. ¶ 14.) Parks has stated that Thomas did not, during the ride, complain about officers using force on him. (Parks Aff. ¶ 4.)

As Laughlin escorted Thomas down a hallway at the headquarters, Laughlin purportedly lifted up on Thomas's handcuffs in a way that hurt Thomas's wrists. (*See* Thomas Dep. at 161–63.) Thomas's handcuffs were removed after he was placed in an interview room. (Interview Video at 00:37 to 01:02.) Surveillance camera footage shows that an officer removed two pairs of interlinked handcuffs from behind Thomas's back. (*Id.* at 01:00 to 01:02.)

At around 5:27 a.m., Detective Jason Sprague interviewed Thomas at police headquarters. (Sprague Aff. ¶ 7 [ECF No. 50-7].) According to Sprague, Thomas never mentioned Laughlin and Rogers's alleged use of force. (*Id.* ¶ 13.) When Sprague asked Thomas why he had a red mark on his forehead and a scratch on his chest, Thomas responded: "I don't know, my friend." (Interview Video at 36:54 to 37:02.) And when Sprague asked Thomas if he had any other scratches on his body, Thomas again stated: "I don't know." (*Id.* at 37:04 to 37:07.) Sprague instructed Thomas to lift up his shirt to reveal any other scratches. (*Id.* at 37:07 to 37:09.) Thomas refused. (*Id.* at 37:09 to 37:20.)

The next day, after Thomas had been charged with kidnapping and rape, Sprague took several photographs of Thomas with his shirt removed. (Sprague Aff. ¶ 10.) The photographs show a small mark over Thomas's right eye, scratches on his chest, and a dark patch on his lower back. (*Id.* ¶ 10; Thomas Photos at PageID 3206–09, 3212 [ECF No. 73-2].) According to

5

Sprague, Thomas did not report, or claim to have suffered, any injuries. (Sprague Aff. ¶ 10.)

## D. The Civil Suit

Following his acquittal at trial, Thomas filed this lawsuit. (*See* Compl. at 1 [ECF No. 1]; Laughlin Dep. at 87 [ECF No. 57-1].) Thomas later filed an Amended Complaint in which he alleges that Laughlin, Morrow, Rogers, and the City of Columbus[2] (1) used excessive force on him, (2) failed to intervene when he was subjected to excessive force, (3) illegally arrested him, (4) illegally searched his residence, (5) harmed him through a municipal custom or practice, and (6) conspired to harm him and cover up their actions.[3] (*See* Am. Compl. at 1, 12–16 [ECF No. 21]; Pl.'s Opp'n to Mot. for Summ. J. at 1 [ECF No. 60].)

Defendants have now moved for summary judgment on these claims. (Mot. for Summ. J. at 1 [ECF No. 48].) And Thomas has moved to exclude certain evidence that Defendants produced in support of their Motion for Summary Judgment. (Mot. to Exclude at 1 [ECF No. 56].) The Court begins with Thomas's Motion to Exclude.

## II. MOTION TO EXCLUDE

Thomas has moved to exclude portions of affidavits submitted by Detective Sprague, Sergeant Morrow, and Officers Lazar, Laughlin, Parks, and Rogers. (Mot. to Exclude at 2–7 [ECF No. 56].) Thomas avers that the affidavits contain irrelevant statements, speculation, hearsay, and improper impeachment evidence. (*See id.*)

Federal Rule of Civil Procedure 56(c)(2) "governs the procedure by which courts must

---

[2] The original Complaint also named Sergeant David Pelphrey and Officers Henry Brown, Jeffrey Lazar, and Theodore Stacy as defendants. (Compl. at 1.) Plaintiff dropped Brown, Pelphrey, and Stacy and added Officer Anthony Parks and Sergeant Morrow as defendants in the Amended Complaint. (*See* Am. Compl. at 1 [ECF No. 21].) Plaintiff later dismissed Parks and Lazar from the lawsuit. (Nov. 29, 2016 Notice at 1 [ECF No. 44].)

[3] Thomas has withdrawn his conspiracy claim under 42 U.S.C. § 1985 and his state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery. (Pl.'s Opp'n to Mot. for Summ. J. at 1–2 [ECF No. 60].)

review objections to the admissibility of evidence presented in connection with a motion for summary judgment." *Smith v. Interim Healthcare of Cincinnati, Inc.*, No. 1:10-cv-582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011). Under that rule, a party may object if it believes that materials cited in support of a motion for summary judgment "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). A party's objection under Rule 56(c)(2) "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* (2010 Advisory Committee notes).

A party may submit affidavits in support of a motion for summary judgment. Fed. R. Civ. P. 56(c)(1). But, as relevant here, such an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## A.    Irrelevant Statements

Thomas first challenges the relevance of several of the officers' statements. (*See* Mot. to Exclude at 2–4 [ECF No. 56].) Evidence is relevant if it (a) "has any tendency to make a fact more or less probable than it would be without the evidence" and (b) "the fact is of consequence in determining the action." Fed. R. Evid. 401.

Thomas contends that the portion of Sprague's affidavit recounting Sprague's investigation of the alleged kidnapping and rape is irrelevant. (*See* Mot. to Exclude at 3.) The Court disagrees. Sprague's investigation offers context on why Sprague interviewed and photographed Thomas, and it lends support to the theory that any injuries suffered by Thomas were incurred when Thomas allegedly kidnapped and raped HB. (*See* Sprague Aff. ¶¶ 4–14 [ECF No. 50-7].)

Thomas also challenges the relevance of the affidavits submitted by Lazar and Parks. (*See* Mot. to Exclude at 3–4.) Thomas notes that neither officer was present in the building when the purported use of force occurred. (*See id.* at 4.) And he notes that neither officer moved him from his apartment without probable cause or heard his alleged complaint to Morrow. (*Id.*) Thomas's argument is not well taken. Lazar's and Parks's affidavits are relevant, as they provide context and support for the theory that any injuries suffered by Thomas occurred when he allegedly kidnapped and raped HB. (*See* Lazar Aff. ¶¶ 3–8 [ECF No. 50-2] (describing HB's allegations against Thomas and Lazar's subsequent investigation); Parks Aff. ¶ 4 [ECF No. 50-6] (stating that Thomas, on the drive to police headquarters, did not mention any use of force).)

B.      **Speculation**

Thomas next contends that portions of the officers' affidavits set forth speculation rather than facts. (*See* Mot. to Exclude at 4–6 [ECF No. 56].) Speculation is typically not permitted in affidavits. *See* Fed. R. Civ. P. 56(c)(4) (stating that an affidavit must "set out facts that would be admissible in evidence"); *Long v. Procter & Gamble Mfg. Co.*, No. 03-1097, 2005 WL 1631033, at *3 (W.D. Tenn. July 8, 2005) ("[S]peculative statements should not be included in affidavits . . . .").

Sprague purportedly engages in speculation when he states that Edythe Straughter, Thomas's neighbor, made no mention of any use of force by the police officers. (*See* Mot. to Exclude at 4–5.) Sprague is purportedly speculating because he has not represented that he explicitly asked Straughter if she saw a use of force. (*See id.*) Sprague's statement is not speculative. He offered a description of his conversation with Straughter. (*See* Sprague Aff. ¶ 11 [ECF No. 50-7].) That Sprague might not have asked about the officers' alleged use of force simply suggests that Sprague's statement should carry less weight than it would if Sprague had

expressly inquired about the alleged use of force.

Thomas asserts that Sprague again engaged in speculation when he stated that Thomas's glasses (which are visible on Thomas's face in the Bollinger Tower surveillance videos as he was escorted from the building) would likely have fallen off if force had been used. (*See* Mot. to Exclude at 5.) The Court agrees that Sprague's statement is speculation, not fact, and should therefore be excluded from the Court's consideration.

Thomas next argues that Laughlin, Rogers, and Sprague engaged in speculation when they stated that two officers would have escorted Thomas out of Bollinger Tower if force had been used. (*See* Mot. to Exclude at 5.) Defendants contend that this statement is not speculative because Laughlin and Rogers "know firsthand whether one or both of them would have escorted [Thomas] had they . . . used force on [him]." (Defs.' Opp'n to Mot. to Exclude at 6 [ECF No. 64].) Defendants' argument fails. Laughlin and Rogers did not explicitly say that they would have been the two officers to escort Thomas from the building. (*See* Laughlin Aff. ¶ 11 [ECF No. 50-4]; Rogers Aff. ¶ 13 [ECF No. 50-3].) Moreover, even if Laughlin and Rogers had made that representation, Laughlin and Rogers' statement on what they would have done in a scenario that, according to them, did not actually happen, inherently involves speculation. Defendants also argue that the two-officer escort statement is not speculative because Laughlin, Rogers, and Sprague were each aware of the CDP's policies regarding detainee escorts. (*See* Defs.' Opp'n to Mot. to Exclude at 6.) This argument would pass muster if the officers had simply stated that CDP policy requires a two-officer escort after the use of force. They did not make that statement though. Rather, they opined that Thomas would have been escorted out of the building by two officers if force had been used. (*See* Laughlin Aff. ¶ 11; Rogers Aff. ¶ 13; Sprague Aff. ¶ 15.)

Thomas also argues that Morrow engaged in speculation when he stated that (i) a specific

box on the arrest form would have been checked if the officers had used force and (ii) Thomas would not have been accepted by the Franklin County Jail if he had suffered serious injuries. (*See* Mot. to Exclude at 5.) The Court agrees that these statements are speculative. Even though, as Defendants argue, the statements might be based on Morrow's personal knowledge, the statements are speculative, nonetheless. The statements are not facts; rather, they are Morrow's opinion on what other people might have done in alternative (from Morrow's perspective) circumstances.

## C.   Hearsay

Thomas challenges several statements from Sprague's affidavit as inadmissible hearsay. (*See* Mot. to Exclude at 6 [ECF No. 56].) Hearsay is a statement made outside of the current trial or hearing that a party offers as evidence to prove the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c). Unless an exception applies, hearsay is inadmissible and cannot support a motion for summary judgment. *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 802.

Thomas asserts that Sprague offers inadmissible hearsay when he recounts his conversations with Thomas, HB, and various other people. (*See* Mot. to Exclude at 6.) Thomas, however, has made no effort to identify the specific statements in the affidavit purported to be hearsay. (*See id.*) And consequently, Thomas does not explain why each purported hearsay statement is inadmissible. (*See id.*) It is Thomas's obligation to identify which statements in the affidavits should be excluded. *See Wilson v. Budco*, 762 F. Supp. 2d 1047, 1058 (E.D. Mich. 2011); *Ernst Seidelman Corp. v. Mollison*, 10 F.R.D. 426, 428 (S.D. Ohio 1950) ("The Court cannot and should not be expected to go through the . . . affidavit with a fine-tooth comb and pick out the certain portions which . . . should be stricken." (internal quotation marks omitted)). And because Thomas has not satisfied this obligation to identify each of the challenged

10

statements, the Court will not exclude the alleged hearsay.

**D.    Impeachment Evidence**

Lastly, Thomas argues that Defendants improperly present impeachment evidence in Sprague's affidavit. (*See* Mot. to Exclude at 6–7 [ECF No. 56].) Impeachment evidence, Thomas correctly notes, should not be considered in a motion for summary judgment. *See Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) ("'[I]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009))).

Sprague purportedly attempts to impeach Thomas (i) when he states that Thomas did not mention being attacked by the arresting officers during the interview at police headquarters and (ii) when he opines that "[n]either [Thomas] nor the officer display[ed] any visible sign of a recent altercation" in the Bollinger Tower surveillance videos. (Sprague Aff. ¶¶ 13–15 [ECF No. 50-7].) Contrary to Thomas's position, the Court may properly consider this evidence. Although Sprague's statements might cast doubt on the veracity of Thomas's testimony, the statements are primarily offered as evidence in support of Defendants' argument that the officers did not use force on Thomas. (*See id.*; Defs.' Opp'n to Mot. to Exclude at 7 [ECF No. 64].)

In sum, the Court grants Thomas's Motion to Exclude in part and will exclude from its consideration on the Motion for Summary Judgment the statements about the use of two officers to escort Thomas, Sprague's speculation that Thomas's glasses would have fallen off if force had been used, and Morrow's speculation about the unchecked box on the arrest form and Thomas's admission to jail. The Motion to Exclude is otherwise denied.

11

## III.  MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the moving party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating a motion for summary judgment, the Court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013); *see Anderson*, 477 U.S. at 255. The existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient though; there must be evidence on which the jury reasonably could find for the nonmoving party. *See Anderson*, 477 U.S. at 251–52; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Thomas asserts his claims under 42 U.S.C. § 1983, which provides a remedy for "the deprivation of rights, privileges, or immunities secured by the Constitution and laws" with

respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on a claim brought under § 1983, a plaintiff must prove (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

## A. Excessive Force

Defendants contend that they are entitled to summary judgment on Thomas's excessive force claim. (*See* Mem. in Supp. of Mot. for Summ. J. at 13–17 [ECF No. 50-1].) To prevail on an excessive force claim, a plaintiff must establish that he was subjected to an unreasonable seizure within the meaning of the Fourth Amendment. *Slusher v. Carson*, 540 F.3d 449, 454–55 (6th Cir. 2008).

Defendants do not dispute the reasonableness of the alleged use of force. Rather, pointing to several pieces of circumstantial evidence that support their position, Defendants argue that there is no *genuine* issue of material fact on whether the officers used any force on Thomas. (*See* Mem. in Supp. of Mot. for Summ. J. at 14–17.) Defendants' argument falls flat. Thomas's testimony that, without any instigation on his part, he was tackled, tripped, kneed in the back, and lifted by his arms and wrists, (*see* Thomas Dep. at 84, 96, 98–101, 103, 106, 117–22 161–63 [ECF No. 46-1]), creates a genuine issue of material fact on whether Laughlin and Rogers used excessive force. *Cf. Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (stating that a suspect has a right to be free from the use of physical force when he is not resisting police efforts to apprehend him); *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (same). And the circumstantial evidence identified by Defendants does not render Thomas's testimony so implausible that no reasonable jury could conclude that Laughlin and Rogers used

excessive force on Thomas.

Defendants first point to the surveillance footage that shows Laughlin escorting Thomas from Bollinger Tower. (Mem. in Supp. of Mot. for Summ. J. at 14–15.) Defendants note that Laughlin's uniform is not disheveled and that neither Thomas nor Laughlin appears to be animated or agitated. (*Id.*) Although this footage might weaken the believability Thomas's testimony, the footage does not disprove it. A reasonable jury could reconcile Thomas's testimony with the surveillance footage in numerous ways. A jury could, for example, simply disagree with Defendants' assessment about Laughlin's appearance and Laughlin's and Thomas's demeanor. Alternatively, a jury could infer, among other things, that Laughlin straightened out his uniform after using force on Thomas, that Laughlin did not disturb his uniform while using force on Thomas, or that Laughlin and Thomas are not easily agitated.

Defendants next point to the video of Thomas's interview with Sprague. (Mem. in Supp. of Mot. for Summ. J. at 15.) Defendants argue that no injuries (a lump on Thomas's head, for example) are visible in the video and that Thomas does not appear to be in pain or discomfort. (*Id.*) Defendants also highlight Thomas's interview statements (and non-statements). Thomas said that he did not know how he obtained a red mark on his forehead and a scratch on his chest. (*Id.*) Thomas refused to lift up his shirt for Sprague. (*Id.* at 15–16.) And Thomas did not inform Sprague that Laughlin and Rogers had allegedly used force on him. (*See id.*) Again, a reasonable jury could reconcile this evidence with Thomas's testimony. A jury could conclude that no lump is visible on Thomas's head because the camera was never focused on Thomas's head and because of the video's low resolution. A jury could conclude that Thomas did not lift his shirt for Sprague because he did not want to reveal his body to a stranger. A jury could conclude that Thomas was in pain despite his outward appearance. And, even if a jury were to agree that

Thomas did not appear to be in pain or discomfort in the video, that conclusion is not dispositive. Being in pain and discomfort after a use of force is not an element of an excessive force claim. *See Slusher*, 540 F.3d at 454–55.

According to Defendants, the interview video also undermines Thomas's assertion that the handcuffs behind his back were each separately attached to his wrists because the video shows that the handcuffs removed from Thomas's wrists were interlinked. (Mem. in Supp. of Mot. for Summ. J. at 17.) The Court agrees that the video shows an officer removing interlinked handcuffs from Thomas's wrists. (Interview Video at 01:00 to 01:02.) But given that Thomas's excessive force claim centers on the officers tackling, tripping, and kneeing him, this video evidence does not defeat Thomas's claim.

Defendants aver that photographs of Thomas taken after his arrest do not reveal any observable marks or injuries other than a "small mark on his forehead and a scratch on his chest." (Mem. in Supp. of Mot. for Summ. J. at 16.) This is another issue, however, on which a jury could reasonably disagree with Defendants' position. The photographs seem to show a small mark over Thomas's right eye, several scratches on his chest, and a dark patch on his lower back. (Thomas Photos at PageID 3206–09, 3212 [ECF No. 73-2].) And given Thomas's deposition testimony that his head struck the wall when Laughlin tripped him, that he landed face down on the floor, and that Laughlin then placed a knee into his lower back, a jury could interpret these markings as injuries received during the officers' alleged use of force. (*See* Thomas Dep. at 98–101, 103, 106.)

Defendants note that Thomas did not tell the medical staff at the Franklin County jail that he suffered injuries from the alleged use of force. (Mem. in Supp. of Mot. for Summ. J. at 16.) A plaintiff, however, need not mention his mistreatment to medical staff in order to bring an

excessive force claim. *See Slusher*, 540 F.3d at 454–55. And, in any event, a jury could reasonably conclude that Thomas did not mention the alleged use of force for fear of retaliation (among other potential reasons).

Lastly, Defendants argue that Thomas's testimony at his criminal trial contradicts his deposition testimony. (*See* Reply in Supp. of Mot. for Summ. J. at 4–5 [ECF No. 70].) Defendants' argument focuses on Thomas's credibility—an issue that the Court cannot consider on a motion for summary judgment. *See Schreiber*, 596 F.3d at 333. And in any event, Thomas's deposition testimony does not contradict his trial testimony. At trial, Thomas stated that the police slammed his head against the wall and that he had never mentioned the head-slamming to anyone prior to trial. (*See* Reply in Supp. of Mot. for Summ. J. at 4–5.) In his deposition, Thomas indicated that the force allegedly used on him involved more than a head-slamming. (*See* Thomas Dep. at 84, 96, 98–101, 103, 106, 117–22.) Thomas, however, was not asked at trial to give a complete description of the officers' alleged use of force. (*See* Reply in Supp. of Mot. for Summ. J. at 4–5.) And although Thomas testified in his deposition to speaking with Morrow about the use of force, Thomas did not actually contradict himself. In his deposition testimony, Thomas testified to telling Morrow: "they . . . physically attacked me." (Thomas Dep. at 150.) In his trial testimony, Thomas stated that he had never before mentioned that "some officer . . . slammed [his] head into something." (Reply in Supp. of Mot. for Summ. J. at 5.)

Because a reasonable jury, viewing the evidence in the light most favorable to Thomas, could find that Laughlin and Rogers used excessive force, those officers are not entitled to summary judgment.

Morrow, by contrast, is entitled to summary judgment. Liability under § 1983 "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*,

199 F.3d 295, 300 (6th Cir. 1999). A supervisor may only be held liable where he has "'encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)). Thomas has testified to telling Morrow that Laughlin and Rogers physically attacked him. (Thomas Dep. at 150.) According to Thomas, Morrow responded by stating that Laughlin and Rogers were "young, inexperienced officers" and by asking Thomas: "Can you forgive them?" (*Id.* at 149.) This interaction is insufficient to support a jury in reasonably concluding that Morrow encouraged or directly participated in the alleged excessive force. *See Shehee*, 199 F.3d at 300. And Thomas's excessive force claim against Morrow, therefore, fails.

**B.     Failure to Protect**

Defendants next move for summary judgment on Thomas's failure to protect claim. (*See* Mem. in Supp. of Mot. for Summ. J. at 13–17 [ECF No. 50-1].) A police officer who fails to act to prevent the use of excessive force may be held liable when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Defendants' argument on this claim is intertwined with their argument on the excessive force claim: they insist that the officers did not use any force on Thomas. Given the Court's determination that there is a genuine issue of material fact on whether Laughlin and Rogers used excessive force, and given that Laughlin and Rogers each observed, according to Thomas, the other use excessive force, those officers are not entitled to summary judgment on the failure to protect claim.

Morrow, on the other hand, is entitled to summary judgment. Thomas argues that

Morrow learned of the excessive force after it occurred and then failed to investigate the

incident. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 11 [ECF No. 60].) No reasonable jury could

find Morrow liable for a failure to protect claim on this evidence. *See Turner*, 119 F.3d at 429.

Thomas has produced no evidence that Morrow observed or had reason to know that Laughlin

and Rogers would use or were using excessive force to apprehend Thomas. (*See* Pl.'s Opp'n to

Mot. for Summ. J. at 11.) Nor has Thomas produced evidence showing that Morrow had both the

opportunity and the means to prevent the harm from occurring. (*See id.*)

## C.      **Illegal Arrest**

Defendants argue that qualified immunity entitles the officers to summary judgment on

Thomas's illegal arrest claim. (*See* Mem. in Supp. of Mot. for Summ. J. at 8–11, 20 [ECF No.

50-1].) Under the doctrine of qualified immunity, "'government officials performing

discretionary functions generally are shielded from liability from civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether qualified

immunity shields a defendant from liability requires the Court to decide (1) whether the facts

produced by the plaintiff make out a violation of a constitutional right and (2) whether the right

at issue was clearly established at the time of the alleged violation. *See Quigley*, 707 F.3d at 680.

The Court may address these requirements in any order. *Id.* at 681. When a defendant raises

qualified immunity as an affirmative defense, the plaintiff bears the burden of demonstrating that

the officer is not entitled to the defense. *Id.*

1.    **Constitutional Violation**

Thomas contends that he was arrested when Laughlin and Rogers took him into custody at his door. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 12–15 [ECF No. 60].) And because the officers purportedly lacked probable cause to believe that he had committed a crime, Thomas argues that his arrest was illegal. (*See id.* at 15.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Seizures generally fall into two categories: investigatory detentions (also known as *Terry* stops) and arrests. An investigatory detention is a brief seizure based on reasonable suspicion of criminal activity. *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991). The scope of an investigatory detention is determined by the circumstances that initially justified the detention: "the officer may ask the detainee a moderate number of questions to determine his identity and try to obtain information confirming or dispelling the officer's suspicions" but "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984) (footnote omitted). An arrest, by contrast, is a lengthier or more intrusive seizure supported by probable cause. *See Richardson*, 949 F.2d at 856.

"Although an officer may have reasonable suspicion to detain a person . . ., the officer's investigative detention can mature into an arrest [that must be supported by probable cause] . . . if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997). "No bright-line rule defines the length or scope of an [investigatory detention] or when such a [detention] becomes an arrest." *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 876 (6th Cir. 2012). In determining

whether a seizure is an investigatory detention or an arrest, the Sixth Circuit has considered factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *Richardson*, 949 F.2d at 857.

To prevail on his illegal arrest claim, Thomas must establish that he was arrested without probable cause. *Cf. Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). Probable cause exists when the police have "'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gardenire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Viewing the evidence in the light most favorable to Thomas, a jury could reasonably conclude that Thomas was arrested (and not just subjected to an investigatory detention) when he was taken into custody at his apartment door. *See Richardson*, 949 F.2d at 856–57. Thomas testified that Laughlin and Rogers roused him from his sleep at 3 a.m. by banging loudly on his apartment door. (*See* Thomas Dep. at 70–72, 74 [ECF No. 46-1].) Laughlin then purportedly tackled, tripped, and kneed Thomas in the back before handcuffing him, lifting him from the floor by the arm and wrists, frisking him, and transporting him outside. (*See id.* at 96, 98–101, 103, 106, 117–22, 125, 142–44.) The officers, Thomas testified, did not ask him any questions during this process. (*See id.* at 84, 116, 122, 125, 143.) And although the officers did not explicitly tell Thomas at the time, Laughlin has since clarified that Thomas was not free to leave police custody. (*See* Laughlin Dep. at 133 [ECF No. 57-1].)

A jury could also reasonably conclude that Laughlin and Rogers lacked probable cause to arrest Thomas. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) ("[T]he existence of

20

probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible."). Laughlin and Rogers knew that HB had accused a man named Lonnie of physically and sexually assaulting her. (*See* Laughlin Aff. ¶¶ 5–6 [ECF No. 50-4]; Lazar Aff. ¶ 3 [ECF No. 50-2].) They had a rough description of Lonnie's height, weight, hair color, and skin tone. (*See* July 1, 2013 Lazar Email at 1 [ECF No. 50-2]; Laughlin Aff. ¶¶ 5–6.) And based on HB's identification of Lonnie's car, they knew Lonnie's last name and that he lived in apartment 4G of Bollinger Tower. (*See* Laughlin Aff. ¶¶ 5–6; Lazar Aff. ¶¶ 3, 5.) The evidence shows, when viewed in the most favorable light, that Laughlin and Rogers took Thomas into custody at his apartment door without even asking Thomas for his name. (*See* Thomas Dep. at 84, 116, 122, 125, 143.) And, critically, Laughlin has testified that he did not believe he had probable cause to arrest Thomas when Thomas was taken into custody by the apartment door. (*See* Laughlin Dep. at 134–35.) Indeed, it was Rogers's intent to merely detain Thomas because it was "still very early in the investigat[ion]." (*See* Rogers Dep. at 26 [ECF No. 59-1].)

In sum, the evidence viewed in the light most favorable to Thomas shows that Laughlin and Rogers arrested Thomas without probable when they took him into custody at his apartment door. The scope of Thomas's illegal arrest claim is limited, however, to the brief period between Laughlin and Rogers taking Thomas into custody and HB identifying Thomas as the person who allegedly assaulted her. No jury could reasonably conclude that the officers lacked probable cause to arrest Thomas after he was identified by HB. *See Sutton*, 700 F.3d at 874 ("An eyewitness identification is generally sufficient to establish probable cause for an arrest . . . .").

The evidence does not show a constitutional violation with respect to Morrow. Morrow's brief interaction with Thomas outside Bollinger Tower (when Thomas purportedly told Morrow that the officers had violated his Fourth Amendment rights), (*see* Thomas Dep. at 145–151), does

not support a jury in reasonably concluding that Morrow encouraged or directly participated in Laughlin and Rogers's alleged unconstitutional conduct. *See Shehee*, 199 F.3d at 300. Morrow is entitled to qualified immunity and, thus, summary judgment.

### 2.    Clearly Established Right

A right is clearly established for qualified immunity purposes if "the contours of the right at issue have been made sufficiently clear to give a reasonable official fair warning that the conduct at issue was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). "[W]hile a right may not be 'clearly established' at a 'high level of generality' or by broad historical assertions, neither must the specific conduct at issue have been found unconstitutional for a reasonable officer to be on notice that the conduct is unconstitutional." *Id.* at 615–16.

The right implicated here—to be free from arrest absent probable cause—was clearly established when Thomas was taken into custody outside of his apartment on July 1, 2013. By that date, "Supreme Court precedent was clear that '*Terry* detentions must be limited in both scope and duration.' The law was clearly established in 'unequivocal' terms that reasonable suspicion justifies only a 'temporary seizure for the purpose of questioning limited to the purpose of the stop.'" *Sutton*, 700 F.3d at 877 (citations omitted) (quoting *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010); *Florida v. Royer*, 460 U.S. 491, 498 (1983)) (internal quotation marks omitted). Given the evidence showing that Thomas was taken into custody through the use of excessive force, that Thomas was not free to leave Laughlin's custody, that the officers did not ask Thomas any questions, and that Thomas was relocated from his front door to outside his apartment building, (*see* Laughlin Dep. at 133; Thomas Dep. at 84, 96, 98–101, 103, 106, 116–22, 125, 142–44), a reasonable officer would have fair warning that Thomas's seizure amounted to an arrest (rather than an investigatory detention), *see Sutton*, 700 F.3d at 877–78, which

needed to be, but was not (when the evidence is viewed in the light most favorable to Thomas),

based on probable cause. Qualified immunity does not entitle Laughlin and Rogers to summary

judgment on Thomas's illegal arrest claim, which, to repeat, is limited to the brief period

between the officers taking Thomas into custody and HB identifying Thomas.

## D.     Illegal Search

Defendants also move for summary judgment on Thomas's illegal search claim. (Mem. in

Supp. of Mot. for Summ. J. at 12 [ECF No. 50-1].) They argue that Rogers conducted a

constitutionally permissible protective sweep when he entered Thomas's apartment. (*See id.*) The

Court agrees.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and

conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327

(1990). Unless an officer has "articulable facts which, taken together with the rational inferences

from those facts, would warrant a reasonably prudent officer in believing that the area to be

swept harbors an individual posing a danger to those on the arrest scene," a protective sweep is

limited to the "spaces immediately adjoining the place of arrest from which an attack could be

immediately launched." *Id.* at 334. If an officer has articulable facts that would justify a broader

sweep, the sweep may, nonetheless, "extend only to a cursory inspection of those spaces where a

person may be found" and may "last[] no longer than is necessary to dispel the reasonable

suspicion of danger and in any event no longer than it takes to complete the arrest and depart the

premises." *Id.* at 335–36.

Thomas argues that Rogers's search was not a protective sweep because (i) it took too

long, (ii) was not completed contemporaneously with the arrest, and (iii) was conducted after

Thomas had been removed from the area of the search. (*See* Pl.'s Opp'n to Mot. for Summ. J. at

16 [ECF No. 60].) These arguments lack merit. Viewed in the light most favorable to Thomas, the evidence shows that Laughlin handcuffed and frisked Thomas in the hallway outside of the apartment, that Rogers entered the apartment and threw shoes to Thomas, and that Rogers then re-entered the apartment as Laughlin escorted Thomas down the hall. (*See* Thomas Dep. at 108–11, 113, 125–28, 142 [ECF No. 46-1].) As to the length of the protective sweep, Rogers has stated that it lasted less than one minute and that he exited the apartment and shut the door after finishing the sweep. (Rogers Aff. ¶ 11 [ECF No. 50-3].) Thomas has not offered any evidence indicating that the protective sweep lasted longer. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 7, 15–16.) No jury could reasonably conclude that Rogers conducted a constitutionally impermissible search based on this evidence. Rogers was in the apartment for less than a minute, (*see* Rogers Aff. ¶ 11), and he conducted the sweep immediately after Thomas had been handcuffed and frisked, (*see* Thomas Dep. at 125–28). And although the evidence shows that Rogers remained in the apartment as Thomas was being led down the hall, (*see* Thomas Dep. at 128, 142), this evidence does not create a jury question on the legality of Rogers's conduct. Rogers is, accordingly, entitled to summary judgment on the illegal search claim.

**E.     Civil Conspiracy**

Defendants request summary judgment on Thomas's civil conspiracy claim. (Mem. in Supp. of Mot. for Summ. J. at 12–13 [ECF No. 50-1].) A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a § 1983 civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *See id.* Vague and conclusory allegations unsupported by material

facts are insufficient to state a claim. *See id.* at 603. A plaintiff, however, need not allege or produce direct evidence of a conspiracy; "circumstantial evidence may provide adequate proof." *Id.* at 606 (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

Thomas argues that Laughlin, Rogers, and Morrow entered into a conspiracy to (i) use excessive force on him, (ii) arrest him without probable cause, and (iii) illegally search his apartment. (Pl.'s Opp'n to Mot. for Summ. J. at 19 [ECF No. 60].) Based on Laughlin and Rogers's testimony that they knocked on the apartment door with the intention of detaining Thomas even though Laughlin did not believe that they had probable cause to make an arrest, (*see* Laughlin Dep. at 130, 134–35 [ECF No. 57-1]; Rogers Dep. at 26, 28–29 [ECF No. 59-1]), and based on Thomas's testimony that Laughlin and Rogers violently took him into custody without saying anything to each other, (*see* Thomas Dep. at 84, 96, 98–101, 103, 106, 116–22, 125 [ECF No. 46-1]), a jury could reasonably conclude that Laughlin and Rogers entered into a conspiracy to illegally arrest Thomas using excessive force.

The evidence is lacking, however, regarding a conspiracy to illegally search Thomas's apartment. Thomas has not pointed to evidence indicating that Laughlin and Rogers shared the conspiratorial objective of illegally searching the apartment. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 19.) The evidence also fails to support a conspiracy claim against Morrow. Thomas argues that Morrow contributed to the conspiracy by neglecting to investigate or report the alleged illegal arrest and excessive force. (*See id.*) This is insufficient, though, to support a jury in reasonably concluding that Morrow entered into a conspiracy with Laughlin and Rogers. Morrow is, accordingly, entitled to summary judgment, and Laughlin and Rogers are entitled to summary judgment on the illegal search portion of the civil conspiracy claim.

## F.    Municipal Liability

Lastly, Defendants move for summary judgment on Thomas's municipal liability claim. (Mem. in Supp. of Mot. for Summ. J. at 17–19 [ECF No. 50-1].) A municipality may be held liable under § 1983 "only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). A plaintiff may attempt to prove a municipality's illegal policy by alleging: "'(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Thomas brings his claim under the fourth theory; he contends that the City of Columbus has a custom of tolerance to federal rights violations. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 17–18 [ECF No. 60].) To prevail on a custom of tolerance theory, a plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). Thus, to establish deliberate

indifference, a plaintiff ordinarily "'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the [policy was] likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

In support of his custom of tolerance theory, Thomas points to Laughlin's testimony that the detectives wanted Thomas detained and transported to police headquarters, (*see* Laughlin Dep. at 130 [ECF No. 57-1]), to Rogers's testimony that the officers came to Thomas's door intending to detain him, (*see* Rogers Dep. at 26 [ECF No. 59-1]), and to Morrow's testimony that Thomas's detention was a usual procedure, (*see* Morrow Dep. at 80 [ECF No. 58-1]). No reasonable jury could find in Thomas's favor based on this evidence. The evidence does not show a clear and persistent pattern of illegal activity. It does not show that the City of Columbus was on notice, or even constructive notice, of the alleged custom of tolerance to federal rights violations. And it certainly does not show that the City acted with deliberate indifference. The evidence only addresses Thomas's case; it does not highlight other purported illegal arrests resulting from the alleged custom of tolerance that might have placed the City on notice or evidenced the City's deliberate indifference. Thomas's municipal liability claim cannot survive summary judgment.

## IV. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment [ECF No. 48] and Plaintiff's Motion in Limine to Exclude Inadmissible Evidence [ECF No. 56] are each **GRANTED IN PART** and **DENIED IN PART**. Morrow and the City of Columbus are entitled to summary judgment on each of the claims brought against them. Rogers is entitled to summary judgment on the illegal search claim. Laughlin and Rogers are entitled to summary judgment on

the portion of the illegal arrest claim concerning Thomas's time in custody following his identification by HB. And Laughlin and Rogers are entitled to summary judgment on the illegal search portion of the civil conspiracy claim.

    **IT IS SO ORDERED.**

9-20-2017

**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**